AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California



FILED

DEC 17 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

|   |   |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Facebook account with username "aki.bihl.9" and<br>user # 100025121259703<br>(Target Account-1) | )<br>)<br>)<br>)<br>)<br>) |

Case No.    18 MJ 6324

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841, 846 | Distribution of a controlled substance and conspiracy to do the same |
| 21 U.S.C. 843 | Illegal use of a communication facility |
| 21 U.S.C. 952, 960 | Importation of a controlled substance |

The application is based on these facts:

See attached affidavit of Michael J. Rod.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael J. Rod, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/14/18

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1
## PROPERTY TO BE SEARCHED

Information associated with the Facebook account that is stored at premises controlled by Facebook, a company whose headquarters is located at 1601 Willow Road, Menlo Park, CA:

a. Username "aki.bihl.9," associated with user #100025121259703, vanity name "Aki Bihl," and used by Akila BIHL (**Target Account-1**).

## ATTACHMENT B

### I.    Service of Warrant

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.    Items to be Provided by Facebook, Inc.

Any and all records, files, logs, or information (whether deleted or not) concerning:

A.    All records or other information regarding the identification of the account, to include subscriber information, full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

B.    Any and all phone detail identification information;

C.    All videos stored by an individual using this account;

D.    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

E.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

F.    All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them to include EXIF data;

G.    All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

H.    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

I.    All "check ins" and other location information;

J.    All IP logs, including all records of the IP addresses that logged into the account;

K.    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

L.    All information about the Facebook pages that the account is or was a "fan" of;

M.    All past and present lists of friends created by the account;

N.    All records of Facebook searches performed by the account;

O.    All information about the user's access and use of Facebook Marketplace;

P.    The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

Q.    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

R.    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

S.    All email communications to include but not limited to; sent, received, deleted, drafted, and stored in the accounts listed above.

T.    All Facebook Messenger communications to include but not limited to; sent, received, deleted, drafted, and stored in the accounts listed above.

//

### III.   Items to be Seized as Evidence

The search of the data supplied by the Facebook, Inc. pursuant to this warrant will be conducted by FBI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the seizure of data, such as communications, records, photos, videos, and location data, for the period from **January 1, 2017 to and including November 29, 2018**:

    a.    tending to identify attempts to import and distribute methamphetamine and other controlled substances;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and distribution of methamphetamine and other controlled substances;

    c.    tending to identify participants, co-conspirators, criminal associates, or others involved in the importation and distribution of controlled substances;

    d.    tending to identify travel to or presence at locations involved in the importation and distribution of methamphetamine and other controlled substances, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the subject account; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 843**.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Michael J. Rod, being duly sworn, declare and state:

### PURPOSE OF AFFIDAVIT

1.      This affidavit supports an applications for a warrant to search the following Facebook[1] accounts:

      a.      Username "aki.bihl.9," associated with user #100025121259703, vanity name "Aki Bihl," and used by Akila BIHL (**Target Account-1**); and

      b.      Username "ssmoncriefPFFP," associated with user #100001990414791, vanity name "Scooters Moncrief," and used by Steven MONCRIEF (**Target Account-2**);

as described in Attachment A-1 and A-2.

2.      Based on the information below, there is probable cause to believe evidence of crimes in violation of Title 21, United States Code, Sections 841, 846, 952, 960 and 843 (Distribution of Controlled Substances, Conspiracy to Distribute Controlled Substances, Importation of a Controlled Substance, and Illegal Use of a Communication Facility), as described in Attachment B, will be found on **Target Account-1** and **Target Account-2**.

3.      Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by task force officers from the North County Regional Gang Task Force (NCRGTF) or other multi-agency federal, state, and local drug/gang task force officers with whom I have spoken, whom were involved in this investigation, or whose reports I have read and reviewed. In this affidavit, I have also included, where appropriate, my interpretation of quoted and/or coded language in parenthesis and/or brackets. Those interpretations are based upon my training and experience, conversations I have had with

---

[1]      Facebook, Inc., 1601 Willow Road, Menlo Park, California 94025 is an Internet company which, among other things, provides electronic communication services to subscribers. Facebook's electronic Messenger service allows subscribers to communicate with other ISP subscribers through the Internet. Subscribers to Facebook use unique screen names and/or email addresses during communications with others. The screen names and/or email addresses may or may not identify the real name of the person using a particular screen name or email account.

1  other law enforcement officers familiar with this investigation, as well as my personal
2  participation in this investigation.

3      4.   Because this affidavit is being submitted for the limited purpose of seeking the
4  search warrant specified above, I have not set forth each and every fact learned during the
5  course of the investigation. Rather, I have set forth only those facts that I believe are
6  necessary to establish probable cause for the requested warrant.

7                          **TRAINING AND EXPERTISE**

8      5.   I am an investigative or law enforcement officer within the meaning of Title
9  18, United States Code, Section 2510(7); that is, an officer of the United States, who is
10 empowered by law to conduct investigations of and to make arrests for offenses enumerated
11 in Titles 18 and 21 of the United States Code.

12     6.   I am a Special Agent of the Federal Bureau of Investigation (FBI), and have
13 been so employed since May 2010. I am currently assigned to the San Diego Field Division,
14 North County Resident Agency. Prior to joining the FBI, I was a United States Marine Corps
15 Judge Advocate serving on active duty from November 2001 until May 2010.  In my capacity
16 as a Judge Advocate, I prosecuted and defended violations of the Uniform Code of Military
17 Justice, acted as the Investigating Officer during criminal proceedings, provided legal
18 assistance to service members, and advised military commanders on a wide variety of civil
19 and administrative matters.

20     7.   I have received twenty-one (21) weeks of training at the FBI Academy in
21 Quantico, Virginia.  During that training, I received instruction regarding a wide variety of
22 investigative techniques that are commonly used in support of a wide range of the FBI's
23 investigative priorities. The training included instruction regarding the use of sources,
24 electronic surveillance techniques, law enforcement tactics, search and seizure laws and
25 techniques, surveillance, forensic techniques, interviewing, and a variety of other subjects.
26 I have acted as the lead investigator on a variety of cases and have participated in multiple
27 cases that have focused on gang related matters.

28

8.    Since July 2012, I have been assigned to the NCRGTF. The San Diego County Sheriff's Department has appointed me an Associate Agent assigned to the Sheriff's Department Special Investigation Division and specifically assigned to the NCRGTF. During my time at the NCRGTF, I have had personal contact with dozens of self-admitted or known gang members and their associates and have discussed their lifestyles, method of operations regarding violent and property crimes, and their drug trafficking and drug distributing activities. I have participated in investigations involving criminal gang members including but not limited to Hispanic criminal street gangs and have performed various investigative tasks involving the following:

a.    Functioning as a surveillance agent and thereby observing and recording movements of gang members trafficking in illegal drugs and weapons, and those suspected of committing violent crimes and trafficking in illegal drugs and weapons;

b.    Tracing monies and assets gained by drug traffickers from the sale of illegal sale of drugs and weapons (laundering of monetary instruments);

c.    Interviewing dozens of witnesses, cooperating individuals, and confidential informants relative to gang activities including: violent acts, illegal trafficking of drugs and the distribution of monies and assets derived from illegal trafficking of drugs;

d.    Monitoring and reviewing thousands of recorded jail calls as well as recorded telephone calls pursuant to Title III court orders in narcotics and gang-related cases as well as handled Confidential Human Sources with access to drug dealers, firearms dealers, gang members and the Mexican Mafia hierarchy; and

e.    Supervising, as a case agent/co-case agent, specific investigations involving criminal gangs, trafficking of drugs, weapons and the laundering of monetary instruments.  Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members frequently discuss criminal activity using cellular telephones and Facebook Messenger and often use coded language to obscure these conversations. I also know that drug traffickers and gang members change phones as a means to evade detection

by law enforcement. Moreover, I know that drug traffickers and gang members obtain phones from third parties and or subscribe to them in fictitious names in order to mask the true identity of the individuals using the phones. I am also aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources, in the furtherance of their criminal activities. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

9.     The following is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillances, interviews, database and public records checks, searches, and Title III intercepts. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested order. Conversations and discussions below are set forth in substance unless noted. I have included in parentheses or in brackets my explanations of coded or veiled speech, based on my training and experience, as well as my familiarity with the facts of this investigation. Dates and times are approximate.

### FACEBOOK, INC.

10.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

11.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names,

4

websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

12.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

14.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

15. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

16. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

17. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

18. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

19. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

20. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The

activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

21.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

22.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

23.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

24.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

25.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

26.    Facebook also retains Internet Protocol (IP) logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of

7

1   the action, and the user ID and IP address associated with the action. For example, if a user

2   views a Facebook profile, that user's IP log would reflect the fact that the user viewed the

3   profile, and would show when and from what IP address the user did so.

4        27.   Social networking providers like Facebook typically retain additional

5   information about their users' accounts, such as information about the length of service

6   (including start date), the types of service utilized, and the means and source of any

7   payments associated with the service (including any credit card or bank account number).

8   In some cases, Facebook users may communicate directly with Facebook about issues

9   relating to their accounts, such as technical problems, billing inquiries, or complaints from

10   other users.  Social networking providers like Facebook typically retain records about such

11   communications, including records of contacts between the user and the provider's support

12   services, as well as records of any actions taken by the provider or user as a result of the

13   communications.

14        28.   Facebook tracks location data for mobile users. The Facebook app has access

15   to a user's location data even when the user is not using the Facebook app.

16        29.   Therefore, the computers of Facebook are likely to contain all the material

17   described above, including stored electronic communications and information concerning

18   subscribers and their use of Facebook, such as account access information, transaction

19   information, and other account information.

20   **FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE**

21   **<u>Background</u>**

22        30.   Starting in December 2017, the FBI and SDSD began investigating

23   methamphetamine distribution by multiple individuals in the San Diego area. Investigators

24   identified Mark Warner (WARNER[2]) as an individual selling methamphetamine in the San

25

26

---

27   [2]  On November 16, 2018, the Honorable William V. Gallo issued a federal arrest warrant

28   18MJ5910 for WARNER for violations of 18 U.S.C. sections 922(g)(1) and Title 21 U.S.C. sections 841(a)(1).  WARNER has not yet been arrested.

Diego area. WARNER has sold methamphetamine to a Confidential Source (CS-1)[3] in controlled purchases that were audio and video recorded and surveilled by investigators, including:

      a.    On February 21, 2018, CS-1 met WARNER at the Lafayette Hotel, 2223 El Cajon Blvd, San Diego, California and, after riding with WARNER when he went to resupply from an individual named Akila Bihl (BIHL[4]), CS-1 purchased approximately four ounces of methamphetamine for $1,000. The narcotics were delivered to the CS by BIHL's girlfriend, Raphaela Moore (MOORE[5]).

      b.    On March 6, 2018, CS-1 met WARNER at Denny's restaurant located at 9898 Mira Mesa Blvd, San Diego, California and purchased approximately 110 grams of methamphetamine for $1,000.

---

[3] CS-1's criminal history includes the following convictions: 1997 misdemeanor conviction for PC 242/243 (Battery); 2001 misdemeanor conviction for H&S 11550(a) (Under the Influence of a controlled substance); 2003 misdemeanor conviction for H&S 11550(a) (Under the influence of a controlled substance); 2006 felony conviction for H&S 11378 (Possess controlled substance for sale); 2006 felony conviction for H&S 11378 (Possess controlled substance for sale); 2006 felony conviction for PC 487(a) (Grand Theft); 2010 felony convictions for H&S 11379 (Transport controlled substance for sale) and PC 459 (Burglary); 2012 felony conviction for H&S 11377(a) (Possess controlled substance); 2013 misdemeanor conviction for PC 148(a) (Obstruct public officer); 2014 felony convictions for PC 459 (Burglary) and HS11360 (Transport marijuana for sale); and 2015 PC 3056 Parole Violation. In November 2017, CS-1 was arrested for a federal drug trafficking crime and subsequently plead guilty to that crime. CS-1 agreed to assist law enforcement in hopes of receiving a recommendation by the Government for a lower sentence. On November 13, 2018, CS-1 received a time served sentence. CS-1 has consistently provided information that has proven credible and reliable. As of June 19, 2018, CS-1 has been paid approximately $14,200 for expenses and $9,921 for services.

[4] On November 16, 2018, the Honorable William V. Gallo issued a federal arrest warrant 18MJ5909 for BIHL for violations of 18 U.S.C. sections 922(g)(1) and Title 21 U.S.C. sections 841(a)(1). BIHL was arrested on November 29, 2018.

[5] On November 16, 2018, the Honorable William V. Gallo issued a federal arrest warrant 18MJ5909 for MOORE for violations of Title 21 U.S.C. sections 841(a)(1). MOORE has not yet been arrested.

      c.     On March 14, 2018, CS-1 met WARNER at the same Denny's restaurant and purchased approximately 56.3 grams of methamphetamine and an AR-15 style rifle for $1,460.

      d.     On April 4, 2018, CS-1 met WARNER at a 7-11 convenience store and purchased approximately 56.9 grams of methamphetamine and a BERSA .380 caliber handgun for $700.

      e.     On June 5, 2018, CS-1 met WARNER at BIHL's residence located at 4138 Arizona Street, San Diego, California, where WARNER helped facilitate the sale by BIHL of approximately 21.8 grams of methamphetamine and a Thompson Super 14 handgun to CS-1 for $660.

31.    This investigation has included the use of district judge authorized Title III intercepts, including cellular telephones used by both WARNER and BIHL. The investigation to date indicates that BIHL and his girlfriend MOORE have multiple sources of supply for methamphetamine. One such source is Vincente Zadoc Lopez Palomores (LOPEZ), [6] a.k.a. "Chaco," who delivers the narcotics and collects the narcotics proceeds. Additionally, BIHL maintains other sources of supply for methamphetamine, including Caroly Sue Saunders (SAUNDERS),[7] who resides in San Diego, California. BIHL distributes narcotics to, or through, several individuals WARNER, Steven Moncrief, a.k.a. "Scooter" (MONCRIEF), Brad Harville (HARVILLE),[8] Lirazel Ford (FORD) and others.

---

[6] On November 08, 2018, the Honorable Robert A. McQuaid issued a federal arrest warrant 18MJ5779 for LOPEZ for violations of Title 21 U.S.C. section 841(a)(1). LOPEZ was arrested on November 15, 2018.

[7] On November 16, 2018, the Honorable William V. Gallo issued a federal arrest warrant 18MJ5908 for SAUNDERS for violations of Title 21 U.S.C. sections 841(a)(1) and 846. On November 29, 2019, SAUNDERS was contacted and served a Notice to Appear for December 18, 2018.

[8] On November 08, 2018, the Honorable Robert A. McQuaid issued a federal arrest warrant 18MJ5780 for HARVILLE for violations of Title 21 U.S.C. section 841(a)(1). HARVILLE is currently on state custody on unrelated charges.

32.    Based on the recorded calls outlined below, the number of BIHL's Facebook Friends that have participated in narcotics transactions with BIHL, Facebook posts located on BIHL's monitored phone, and my training and experience, I believe that BIHL and MONCRIEF have used **Target Account-1** and **Target Account-2** to communicate with both drug customers and drug suppliers in order to further their respective drug distribution activities.

### Intercepted Calls Indicating Use of Target Account-1

33.    During the course of this investigation, BIHL has had conversations regarding narcotics transactions with an unidentified female named "Mindy" that indicated that BIHL used **Target Account-1** to discuss narcotics transactions. Further, BIHL and MOORE have been intercepted on multiple occasions discussing narcotics transactions with various subjects of this investigation. During those conversations, BIHL and/or MOORE have made statements indicating that BIHL used **Target Account-1** to communicate about those narcotics transactions.  Examples of these conversations are outlined below.

### Calls Indicating that Target Account-1 Was Used Re: Taxes on Narcotics

34.    On July 13, 2018, at approximately 2:45 p.m., "Mindy" called BIHL on the monitored line.  During the call, Mindy discussed a gang member named "Chato" that was collecting taxes from drug dealers and expressed concern for BIHL's safety. In this conversation, Mindy and BIHL discussed contacting this gang member on Facebook Messenger from **Target Account-1**.

35.    During the call, Mindy stated, "It was him, it was him... he slipped up and said he was with Chato."  BIHL asked, "Really?" Mindy continued, "Dude, I know it was him... then some girl called me... 'Hey Mindy, does your people pay rent [pay taxes for selling narcotics],' 'Why what's up...'  I go, 'If he makes the wrong friend and robs the wrong motherfucker know my people pay rent.'" BIHL replied, "Hmm." Mindy continued, "I lied I don't care if you do or you don't, I don't want to know. I don't want them [UI] you know what I mean." BIHL replied, "You don't want nothing to do with that shit this is your ex-old man." Mindy continued "I don't want that to be on me."  BIHL replied, "I know."

36.     During the same call, Mindy continued, "I'm telling him to pay rent, and I called my plug [source of supply for narcotics] and told my plug, he looked out for it." BIHL replied, "Okay." Mindy continued, "You think I'm not doing everything to cover my ass... I don't want nothing to happen to you ever, I fucking care you about you and I love you dude... you think I fucking [UI]...going on." BIHL responded, "I don't know, you've been gone for a couple days, I don't know where the fuck you've been, you know what I mean?" Mindy replied, "I'm not abandoning you... I don't want the drama to be at your house." Later in the conversation, BIHL stated, "[S]o I gotta watch out for that dude?" Mindy stated "Chato." BIHL confirmed, "Chato?" and Mindy confirmed, "[Y]eah, from Logan." Bihl replied,  "Okay, I'll watch out for him."

37.     During the same call, Mindy continued, "Yeah, because [UI]... I'm gonna friend request him on your messenger [**Target Account-1**], Okay?" and Bihl replied, "Okay." BIHL asked, "You can't get into your messenger from that phone?" Mindy said, "No, I can't because I don't know my passwords... and he sold my phone to his connect [source of supply for narcotics]." Bihl says "Okay, well, when you can bring it over here and we will switch it [Facebook Messenger account] over to you." Mindy replied, "Okay."

38.     A review of BIHL's Facebook friends list revealed a Facebook friend named "Mindy Montalvo." Based on the above call, I believe that Mindy requested BIHL to permit her to contact "Chato" via **Target Account-1** and BIHL voiced his preference that Mindy contact Chato via her own Facebook Messenger account. Since Mindy requested that BIHL allow her to use **Target Account-1** to contact Chato, I believe that BIHL frequently contacts individuals associated with his drug distribution network via Facebook Messenger; specifically, **Target Account-1**.

## Calls Indicating BIHL Has Used
## Target Account-1 to Contact a Narcotics Customer

39.     On July 8, 2018, at approximately 1:37 p.m., MOORE contacted BIHL on the monitored phone. During the call, MOORE informed BIHL that an unidentified male named "Shawn" was attempting to contact BIHL. During the call, MOORE asked, "Hey, you're

alright?" BIHL responded, "Yeah, why?" MOORE explained, "OK, Shawn messaged me and said he's been trying to get a hold of you and you're not answering so he was wondering if you are OK..." BIHL replied, "He hasn't tried calling me." MOORE answered, "He said he's been calling you and you're not responding." BIHL responded, "Then he's calling the wrong number cause I've been sitting right here." MOORE replied, "OK, I'll tell him. Maybe he's been messaging you or something." BIHL responded, "OK, I'll check that."

40.    A review of BIHL's Facebook Friends list revealed a Facebook Friend named "Shawn Patten." Investigators have monitored multiple text message exchanges between Patten and BIHL, including a text message exchange regarding a narcotics transactions. A review of BIHL's incoming calls prior to the call between BIHL and MOORE on July 8, 2018 at 1:37 p.m. revealed no incoming calls from Patten. I believe that MOORE's statement "Maybe he's been messaging you" indicated that Patten was contacting BIHL on **Target Account-1**. Additionally, I believe that BIHL's response, "Okay, I'll check that" indicated that BIHL intended to check **Target Account-1** for communication from Patten.  The fact that there were no incoming calls to BIHL from Patten prior to the 1:37 p.m. call between MOORE and BIHL, further buttresses my belief that Patten was attempting to contact BIHL on **Target Account-1.**

## Facebook Friends of Individuals Involved in Narcotics Transactions

41.    A review of BIHL's Facebook Friends list associated with **Target Account-1** revealed multiple people that are conducting narcotics transactions with BIHL, including WARNER, MONCRIEF, HARVILLE, and others. Examples of individuals on BIHL's Facebook Friends list associated with **Target Account-1** that are involved in narcotics transactions are listed below:

a.    BIHL is Facebook Friends with WARNER. As outlined above, WARNER has conducted multiple narcotics and firearm transactions with CS-1.

b.    BIHL is Facebook Friends with MOORE. As outlined above, MOORE has assisted BIHL in coordinating various narcotics transactions as well as delivering the narcotics to CS-1 during the controlled purchase that occurred on February 21, 2018.

c.   BIHL is Facebook Friends with MONCRIEF.  During the course of the investigation, BIHL and MONCRIEF have been intercepted coordinating pound quantity narcotics transactions. For example, on July 11, 2018, at approximately 1:29 p.m., BIHL received an incoming call on a monitored line from MONCRIEF. During the call, MONCRIEF asked BIHL, "You ready for me to come by [to pick up narcotics]?" BIHL responded, "Yeah, OK, cool 'cause Caroly [SAUNDERS] hasn't dropped those [narcotics] yet." MONCRIEF then asked, "What happened to the two [two pounds of methamphetamine]?" and BIHL responded, "That's what I'm saying. But it's all gonna be settled when you get here, you know what I mean? Plus, you got some of that other one [other narcotics delivery]. You know what I'm talking about?" On July 26, 2018, investigators executed a search warrant at MONCRIEF's residence (he was home) and seized approximately 10 pounds of methamphetamine, as described below.

d.   BIHL is Facebook Friends with HARVILLE. During the course of this investigation, BIHL and HARVILLE have been intercepted coordinating large narcotics transactions. For example, on July 14, 2018, at approximately 9:30 p.m., HARVILLE contacted BIHL on the monitored phone. HARVILLE explained to BIHL that his friend "has a big wallet" and had one to two thousand dollars to spend. BIHL responded, "Oh, so he wants to spend 19 [$1900]." HARVILLE responded, "Yeah, is that feasible?" BIHL answered, "Yeah, right now but better hurry." Pole camera footage confirmed HARVILLE arrived to BIHL's residence driving a light colored Chevrolet SUV bearing license plate number 8DDD778 at approximately 10:15 p.m. The following day, on July 15, 2018, at approximately 10:00 a.m., HARVILLE contacted BIHL. During the call, HARVILLE advised BIHL that he spoke to an unidentified male named "Greg" and asked "2 [p.m.], but what's convenient for you?" BIHL asked, "For what?" and HARVILLE answered, "To do the other..." BIHL and HARVILLE both stated, "The other half." BIHL and HARVILLE agreed to meet later that day. Later that day, surveillance agents observed HARVILLE and a female

14

1   arrive at and enter BIHL's residence. The surveillance agents later observed
2   HARVILLE and the female exit BIHL's residence and depart in the light colored
3   Chevrolet SUV. Investigators requested a SDPD marked patrol unit make a traffic
4   enforcement stop of the vehicle. The SDPD patrol officer observed a package
5   apparently tossed out of the passenger side window of the vehicle that HARVILLE
6   was driving. Investigators later recovered approximately 3.5 ounces of
7   methamphetamine on the sidewalk from the area. HARVILLE and the female were
8   arrested for booked into county custody and charged with multiple drug related
9   crimes.

10   **Facebook communication between Target Account-1 and Target Account-2**

11   42. On July 26, 2018, investigators executed search warrants at multiple residences
12   associated with MONCRIEF. At MONCRIEF's residence located in Temecula, California,
13   investigators located multiple pounds of suspected methamphetamine, firearms, a large
14   amount of U.S. currency, scales, and packaging material in a safe in the garage.
15   MONCRIEF was present at this location when the search warrant was executed.
16   Investigators also seized a blue Harley Davidson used by MONCRIEF to transport
17   narcotics. A portion of the suspected methamphetamine was sent to the DEA laboratory for
18   analysis, which confirmed the presence of methamphetamine in the amount of 1456 grams
19   of methamphetamine (actual). MONCRIEF's cellular telephone was seized and
20   investigators attempted to search it pursuant to a federal search warrant; however,
21   investigators were unable to access the contents of MONCRIEF's cellular telephone.

22   43. On July 31, 2018, investigators executed a search warrant at BIHL's residence.
23   Investigators located a handwritten note in BIHL's wallet that contained MONCRIEF's
24   address where the above evidence was seized. Additionally, investigators located two
25   bundles of cash in the amounts of two hundred dollars and two thousand dollars.
26   Investigators also seized BIHL's cellular telephone, which was searched pursuant to a
27   federal search warrant. The contents of BIHL's cellular telephone also showed contact

28

1  between BIHL using **Target Account-1** and MONCRIEF using another person's Facebook

2  account and **Target Account-2**.

3      44.      Shortly after the search warrant at MONCRIEF's residence, MONCRIEF

4  contacted BIHL on **Target Account-1** from someone else's Facebook account.  The message

5  sent to **Target Account-1** read, "Hey it's scoot [MONCRIEF] I'm home video chat this with

6  messenger I have no phones right now they were ceased but I had them reported lost and

7  everything factory reset to swipe then clean I have news phones coming tomorrow but I need

8  you to hit me up ASAP." A separate message was sent by MONCRIEF to **Target Account-**

9  **1** that read, "Fuck dude call me you are good this all happened cuz more [believed to be

10 referring to MONCRIEF's wife, Mellena MONCRIEF] has been selling to a narc in dago and

11 just like I've fucking said from the beginning she's gonna get me caught when she gets

12 cracked they too[took] my blue bike they took tons of my club stuff."  BIHL responded to

13 MONCRIEF using **Target Account-1**, "Hey bro,youre wrong about it not being about me.

14 My homeboy got pinched also."

15      45.     A review of BIHL's cellular telephone also showed communication between

16 BIHL, using **Target Account-1**, and MONCRIEF, using **Target Account-2**. For example,

17 the below exchange between BIHL, using **Target Account-1** and MONCRIEF, using

18 **Target Account-2**, was located on BIHL's cellular telephone:

19      **From Target Account-1**: "At home,just got here"

20      **From Target Account-2**: "Ok let me kno if yu need anything I'm out gathering for

21 yu [collecting money owed for drugs previously provided] could have most it covered by

22 tonight no sure"

23      **From Target Account-1**: "Alright bro, thank you."

24      **From Target Account-2**:  "I have 2 [$2000] for yu."

25      **From Target Account-1**:  "Wuddup brother?  How you feelin today?"

26      **From Target Account-2**:  "I'll visit sometime today."

27      **From Target Account-1**:  "Ok."

28

46. Based upon the intercepted calls between BIHL and MONCRIEF and MONCRIEF and others involved in the conspiracy, the messages between **Target Account-1** and **Target Account-2**, and the items located during federal search warrants at MONCRIEF's residence and BIHL's residence, I believe that MONCRIEF traveled to BIHL's residence to provide money for narcotics that were previously provided to MONCRIEF by BIHL and were seized by law enforcement.

### TRAINING AND EXPERIENCE RELATED TO FACEBOOK

47. I have personally debriefed multiple drug users and drug dealers that have discussed their use of Facebook Messenger to conduct narcotics transactions. I have downloaded multiple cellular telephones of known drug dealers that included evidence of drug sales in the Facebook Messenger communication. I have also operated multiple Confidential Sources that I have directed to arrange for controlled purchases of narcotics and firearms via Facebook Messenger. Several of these controlled purchases were conducted primarily via Facebook Messenger.

48. Based on the above listed recorded calls referencing Facebook Messenger, the Facebook Friends associated with **Target Account-1** that are involved in narcotics transactions, and the communication between **Target Account-1** and **Target Account-2**, and my training and experience, I believe that BIHL used **Target Account-1** and MONCRIEF used **Target Account-2**, to communicate with each other regarding narcotics transactions as well as other drug customers and drug suppliers to further their drug distribution activities.

### PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

49. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook, Inc. (hereinafter "the internet service provider" or "the ISP") are not. It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those

17

accounts on the premises of the ISP.  The impact on the ISP's business would be disruptive and severe.

50.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored videos, photographs, and any other content from the Facebook accounts, as described in **Attachment B**. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the Federal Bureau of Investigation seeks authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure.  The copies will be provided to me or to any authorized federal agent.  The copies will be imaged and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to **Attachment B**.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

51.     Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software.  It may also be very time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text.  Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISP do not always organize the electronic files they provide

chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

52. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to **Attachment B**. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

53. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject accounts and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

54. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**GENUINE RISK OF DESTRUCTION OF DATA**

55. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, preservation letters were sent to Facebook in anticipation of this application for search warrants.

**PRIOR ATTEMPTS TO OBTAIN DATA**

56. The United States has not attempted to obtain this data by other means other than the limited viewing of publically accessible content as described above.

//

//

19

**SERVICE ON FACEBOOK**

57.     Because the warrant will be served on Facebook, who will then compile the requested records, there is reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to Title 18 United States Code Section 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**CONCLUSION**

58.     Based on the foregoing, I believe there is probable cause to believe items that constitute evidence of violations of federal criminal law, namely, of Title 21, United States Code, Sections 841, 846, 952, 960 and 843, as described in **Attachment B**, will be found in/ the properties to be searched, as provided in **Attachment A-1** and **A-2**.

Michael J. Rod
FBI Special Agent

SUBSCRIBED and SWORN to before me

this ___/4/___ day of December, 2018

HON. BARBARA L. MAJOR
United States Magistrate Judge